Good starting point is to talk about the different types of drug testing cases that we see. As a lawyer who does employee side employment law, I get phone calls about this all the time. They say I failed my drug test. Well, some of them just say it's not fair. Well, I can't help that. Some of them say it's not accurate. I can't do much for that. Some of them, however, of course, are going to say they picked me out for the drug test because I am black, I'm Muslim, I am something like that. Those are a different sort of case. Then we do get the cases like the kitchen case, which Judge Englehart was on the panel for that one, where you had an alcoholic. And the argument in that case was that the alcoholism itself was a disability. And the employee was put on a restriction that said that you were to test you, and you can be fired if you test positive for alcohol, which he did. And he then made the argument, well, you're firing me because of my alcoholism. And the court quite rightly said, no, that's not what's going on here. Your bilingual workplace rule, it's not, the company essentially accommodated you for your alcoholism, but giving you time, putting you on restrictions, and saying you have to stay sober. You know, the mere fact that you're going to get a free pass on being intoxicated at work. This case then takes it to an entirely different place, where the disability is certainly not alcoholism or drug abuse. It's hepatitis C, which is a virus that attacks the liver. There's really no dispute that Mr. Gamble had hepatitis C. It had been in remission for a number of years. It came out of remission. He was actually hospitalized in September of that year with hepatitis C, and he had both fluid buildup that had to be removed, and they also found cirrhosis, which is scarring of the liver. When he came back to work, he encountered hostility from his supervisor, who did not like the fact that the hepatitis C was causing problems with him getting to things, and he had actually said, well, why don't you just give me a little flexibility on when I get to work, and his supervisor said, no, we're not accommodating that. Then we have the supervisor continuing to complain about the fact that he was having issues, which are tied to his hepatitis C, or at least on this record, there's a fact question whether they're tied to his hepatitis C, and comes up with this idea, let's go get a drug test, and if we presented evidence, which is a separate issue on the admissibility of the evidence, but that was entirely pretextual in the first place, that his own supervisor, his lead man, testified. Before we get to that, what information was transmitted to the employer by the plaintiff in this case? Did he simply disclose that he has an illness? Did he go so far as to describe his medication, or did he supply some type of doctor's letter or medical record or anything of that sort? Yeah, what's in the record is this. Number one, when he came back from the hospital, he and his lead man talked to the supervisor, Mr. Bergeson, and told him that he'd been in the hospital, and his supervisor actually said, you know, Mr. Bergeson says, I can't do this for everybody, and his supervisor says, not everyone has hepatitis C, so there's that. Secondly, the record shows that Mr. Gamble had submitted his medical records when he came back to work, and that when he was being sent off to the test, the supervisor actually had the file in his desk. I think the way he described it was sitting back on a copier behind him. He picked it up and said, yeah, I've got this, and then he told the supervisor, I'm on medications, I'm on prescription medications. When he got to NOVA, which is the center where you sample, that's not the testers, NOVA is a clinic you go to to give the sample, that he called the HR and said, I'm on prescriptions, do you know this? He got voicemail according to that, and then, you know, after the test results came in, he put in writing to HR, Ms. Suttles, I've got hepatitis, here are the symptoms I'm having. So, the employer was well on notice that he had this issue, and that he was on prescription medications for it. He, you know, Mr. Gamble is an interesting character, and that's another thing, of course, if you represent employees like I do, you get some interesting characters, but he was actually very good about that, telling everybody, look, I'm on prescriptions, you're sending me for a drug test, you know, you need to do something, and under those circumstances, the employer is certainly on notice, and there's an issue in fact, about whether he was being sent on the drug test legitimately, or whether it was, you know, it was a fishing expedition to get him terminated, but that's a fact question, ultimately. The jury would have to just decide that, listen to these facts, and see the people lie. The important thing is, you know, we we made a very diligent effort on both sides, in this case, to try to get the actual laboratory test results, and remarkably enough, we were never able to do it. I let Ms. Lindbergh, trial counsel, take the lead, because DISA, the company that does this, is their client. They pay DISA to do the drug testing, and the, we, you know, they sent subpoenas to both DISA, first of all, and to, and what came back was just this one sheet, that's just the summary, it's not the lab test result itself, you know, the actual readings. Then we sent one to University Services, which is where the medical review officer, or MRO, is, and we figured that, well, they have to have it, because they've reviewed it, and there's actually a notation in the record. I thought I'd written down the page numbers of this, but the, well, I get the DISA subpoenas record 246, and University MRO is 250. Did you take the deposition of the medical review officer? No, we did not. We, what we got back was the, a notation that they had no records, that they did not have medical records. What we wanted to do on both sides was to actually get the lab test results, so that expert witnesses could look at them, and be able to opine, you know, what happened here with this test. Wouldn't the medical review officer have some idea of whether any of the medication he was taking would have caused a false positive? He might, he might not. I would, that's, you know, he, the, of course, you know, in this case, Forum is trying to say the fact that he sent along the test results is an indication they thought it wouldn't, but he didn't say that, and that's it, that becomes an open question, and the reason you can't do that is we don't know that the lab test results actually show. But you've got the doctors confirming that it was a positive test. Well, what I mean is, what I mean is the underlying lab, you know, a test like this is, there are two different types of tests. One of them is that goes into the blood and looks for certain types of antibodies. The other one is a mass spectrometer, whatever, and you're going to get readings from that, and there's a reading, it's a certain type of substance in the urine, and if you don't know what those readings are, you really cannot accurately say whether, what caused it. You can only speak in abstract terms, you know, would this type of drug, you know, is it likely to do this, and the like. But you don't know, if you don't know what the actual lab test result shows, you're only, you can only speculate about what, whether or not a particular substance could have caused a false positive. What we do know here, at least the fact, there's factual dispute, possibly, but Mr. Gamble testifies that the medical review officer said, okay, you're entitled to a retest, go call HR and set it up. I'm paraphrasing, of course. And that he called HR and said, let's retest me, take these prescriptions out. And under those circumstances, the company ignored him. And in fact, you know, he actually put it in writing later on, immediately after he was fired, saying, hey, what are you talking about? He said I could have another test. The reasonable thing, common sense thing, is you have an employee who is on a whole bunch of medication, I think everyone just knows at a layperson level that could affect a test, that you can't have somebody on a test. Whether you're a scientist or not, you would know that if you want to have an accurate result, a fair result, you want to make sure that you have control for whatever those prescriptions are, that either you get the person off those prescriptions long enough that they're clean, or that the person in the lab knows to be watching out for this, that, and the other thing. But that didn't happen here. By the time it got to the medical review officer in Philadelphia, all he had was apparently just that one sheet. Because like I said, we subpoenaed them. We were working together cooperatively on this, but I let Forum take the lead. But we subpoenaed looking for those documents. In fact, we talked to the council in Texas for the drug testing company, telling them here's what we want. We were, both sides wanted to get those because obviously they would be material, but we were unable to get them. And that's a frustration, but it is what it is. So what we have in the end is a man who has a disability, hepatitis. He's on prescriptions. The company knows this. The drug testing medical review officer is told about this, and according to Mr. Gamble, he says, you can be retested. Talk to your company. He talks to his company. The company doesn't respond to him. And in fact, the company claims they haven't heard from him when they fire him, even though we can show emails that he sent to them. So they were in touch with him. What we would tell the jury is the company didn't care. The company wanted to get rid of him. Mr. Bergeson wanted to get rid of him, and the HR person faced with this situation took the easy way out of saying, I've been unable to reach you. I don't know anything. You're fired. That way she doesn't have to deal with the fact that there is some level of antagonism between Mr. Bergeson and Mr. Gamble, which we would contend is related originally to the fact that he had hepatitis that was causing attendance issues that he had asked for an accommodation. He didn't use that magic term. He said, maybe I could be flexible getting in between, I think it was 645 and 715. It's in the record. Let me ask you why you still have time. As you know, Judge Lake wrote a very lengthy and thorough opinion in this case. Obviously, you're appealing it as you have every right to do. I'm sure you could point out several things that you believe were erroneous, but tell us if we were reading that as a whole, where do you think it was significantly that Judge Lake, in your view, made the wrong turn that led him to the wrong result? Again, I'm not asking you to narrow your complaint to just one thing, but what would be the significant fork in the road where you think he made the error that caused the result? Yeah, I think it really comes down to his evidentiary ruling. He chose to disregard those two pieces of evidence. First of all, that Ms. Miller, the person who said that Mr. Gamble was acting erratically, that she later told Mr. Gamble, Mr. Berkison pressured me to do that. That was not objected to in the trial court, but Judge Lake's response, he said that's hearsay, which is not correct. We briefed that in our reply brief at some length. It is admissible as a statement by a current employee of the company. The reason that's important is that there was no evidence that Mr. Berkison had any bias based on the disability. That was very important to Judge Lake. By excluding that evidence, he was able to say, well, there's no proof that there was any disability-related bias. I believe he may have also said, or I may be confusing this with the appellate position forum, that there was no evidence that Mr. Gamble ever told Mr. Berkison that he had hepatitis C. But again, that's in the record that Mr. . . . Actually, it wasn't Mr. Gamble who told him that. It was Mr. Alvarado who told him, who used the words hepatitis C. Furthermore, the medical records, which are before the court, in the record, were sitting in Mr. Berkison's office, and they talk about hepatitis C. Those were the things that Judge Lake . . . the other Judge Lake liked to say, well, they had no reason to . . . there's no reason to find any disability-related bias here. But we would submit to you that there was ample reason in the record, in the evidence before the court, from which a reasonable jury can say, yes, there was disability-related bias. Mr. Berkison had a problem with the fact that the hepatitis C was affecting Mr. Gamble's attendance, which is not an unusual issue for an accommodation, that sometimes people have accommodations that affect their attendance. Tardiness is not inherently excused, but it's something that can be accommodated if it's tied to a disability. In fact, it can be picked up by the FMLA with your intermittent leave in some situations, but that's getting us . . . that's getting down the road. A jury could find that Mr. Berkison did have bias based on the disability, and that that is what fueled everything that happened afterwards. It would be great if we had those test results, and we could tie that knot. And, like I said, both sides were working to try and get those results, but we were not able to get them, and so we're left with the facts that we have. As I say, a reasonable jury could find, number one, that Mr. Gamble was terminated because of his disability. What kind of work did Mr. Gamble do? I'm sorry? What kind of work did the plaintiff do? He's a machinist. What kind of machinery does he work with? What do you call the computer . . . I'm a . . . they are computer-controlled machines. Like a lathe, maybe, or something? Yeah, there's another term for it, and I'm sure counsel will know what I'm talking about, but they're basically . . . you punch a button, and the computer causes the the term for that. But it's a common type of machine in industry, and he was an operator of that kind of machine. Okay, you saved time for rebuttal. Thank you. Thank you. Hart? Thank you, Your Honors. May it please support Stephen Hart for Energy Technologies. The sole issue in this case, with respect to Mr. Gamble's discharge, is pretext. And the sole issue with respect to pretext is whether or not the company reasonably relied on the drug test result, because that is the reason that forum terminated Mr. Gamble, is because of the drug test result. Now, I heard a lot of things from Appellant while he was up here about the drug test and the underlying results of the drug test, and whether it created a false positive, et cetera, et cetera. And I heard a lot of things from Appellant's counsel about attendance issues and other things. Nowhere in Appellant's counsel's presentation was there anything addressing the issue of the company's reasonable belief that the drug test result was valid. That just wasn't addressed at all. And forum has a drug test policy. It's in evidence. It's in our record excerpts. And that drug test policy specifically acknowledges the fact that prescription drugs, legal prescription drugs, can, in some instances, create false positives. And the drug testing policy has a very specific procedure to deal with that. That procedure says that the medical review officer makes the determinations about the validity of drug tests. It specifically talks about this. At record 194, all confirmed positive drug tests will be reviewed by a medical review officer to determine whether there is any legitimate explanation for the positive drug test result. That's at section 1.3.1 of the company's policy, of the drug test policy. Section 1.3.2 goes further and specifically says, an employee or applicant's use of prescription and over-the-counter medications may result in a positive drug test result. Employees and applicants will be given the opportunity to discuss with the MRO any legitimate explanation for the positive drug test result. If the MRO determines that there's a legitimate explanation, it repeats that language. If the MRO determines that there is a legitimate reason for the drug test result, the MRO will not submit a positive drug test result to the company. If the MRO determines that there is a legitimate medical explanation, or excuse me, that there is no legitimate explanation for the confirmed positive result, then it will, he will submit the drug test result to the company. So there is a specific procedure in place to address the very issue that's been raised by a pilot in this case. Uh, Foreign Energy Technologies is not a drug testing company. What about the retest? Well, the procedure doesn't provide for a retest. The procedure provides for the employee to talk to the medical review officer, which in fact happened in this case. There's no dispute that Mr. Gamel was allowed to talk to the medical review officer. He was allowed to tell him about all of his prescriptions. He had that conversation with him. There is a dispute about, uh, this business about the MRO saying, oh, well, you can take a retest. That's all coming from, it's not coming from the medical review officer. The medical review officer was not deposed. Uh, Mr. Gamel was relying on his own assertion of what the medical review officer said, which is hearsay, which the district court got right in excluding, um, uh, that, that evidence. And I understand this. Is the medical review officer an employee of the company? Absolutely not. The medical review officer is employed by DISA. DISA is a third party company. The whole reason why Forum, uh, relies on DISA for the drug test results is because it's not the company. Forum is not in the business of conducting drug tests. It's not in the business of, of interpreting drug tests. It's not in the business of determining whether or not someone's positive. That's not what they do. They don't have a retest. It does not provide for a retest. No. No, there's nothing in the record about that. There is no such unwritten policy. That's not how it works, Your Honor. The way it works is the way the policy is written. If the, if the, if DISA says that, okay, we've considered what the employee said about prescription drugs and we find that, well, there's no valid, uh, that, that this could provide for a false positive, it just doesn't send us that result. It just doesn't send it. And, and, uh, it doesn't get back to the company and send a result that says it's positive unless they have already determined, uh, that whatever the employee said about prescription medications didn't cause a false positive. Those procedures, Your Honors, give the company a legitimate, reasonable basis to rely on the drug test result, which is why when Mr., when Mr. Holmes says, well, they told him about, um, prescri, you know, he tried to tell people at the company about his prescriptions. Well, that doesn't matter because the company doesn't do that. That's not what they do. It's not their job to try and figure out whether or not a prescription, whether or not a prescription is going to cause a positive drug test result. That's the whole reason why they have a separate company to deal with that, uh, because they don't have the expertise. And by the way, this entire line of argument that, well, hey, they trumped up this drug test and, um, you know, they created an issue or they're fishing expedient, whatever you want to call it, this idea that the drug test, uh, was bogus in terms of asking him to do it. Number one, the district court was right on the hearsay issue, uh, with respect to Ms. Miller, and I don't want to get, um, far down the field on that because I think we've fully briefed that and we cited to a case that's right on point with the hearsay exception that he's talking about. Uh, but even beyond that issue, number one, number one, um, even beyond that issue, Ms. Miller was not the only person who saw Mr. Gamble acting erratically. There was this other person, uh, Mr. Peterson, who very specifically said Mr. Gamble was acting erratically, and that employee, uh, not a member of management. There is no evidence in the record anywhere that says that Mr. Peterson admitted to feeling pressured. There's no evidence from Ms. Miller's supposed recantation that even mentions Mr. Peterson. There's no record evidence at all that Mr. Peterson was lying when he said that he thought Mr. Gamble was acting erratically. In short, that evidence is undisputed. Uh, there was a reasonable basis for the company to do this test, and by the way, it wouldn't make any sense for an employer to ask for a drug test of an employee unless they actually had a reason to believe that it might come back positive because if they're just fishing and trying to get the employee fired, well, if the employee is not doing anything improper, the drug test is going to come back negative. So there would not be any reason to go down that road, and to the extent, um, uh, appellant argues that, well, I told them about my hep C and my prescriptions, well, in order for that to cause some sort of, to be some sort of a motive, there would have to be some evidence that the people who made the decision to ask for the drug test were medical experts, which there's no evidence of that. There would have to be some evidence that they knew, well, yeah, he's on hep C and he's, he's taking such and such medication, so therefore he's going to test positive. There's no evidence in the record of that anywhere, and in, in fact, there's no evidence. Appellant says, well, I gave him my medical records. No evidence that anybody in the company read those medical records. There, there, there's, well, I told them I was at hep C. No evidence in the record that anybody he told about that was a medical doctor or had any medical training whatsoever. There's literally no basis in this record for anyone to say that the company had any, uh, reason to dispute or reason to doubt the, the, the document that came back, the positive test results that came back from DSA. They don't have the expertise. That's why they farm it out. But there's a lot of evidence in the record that the company knew that he had hepatitis C. I mean, the, the, they had, he had that, that conversation that it was between the lead and him about the, you know, cutting some slack about getting in late and so forth. Well, and, and, and thank you, Your Honor, for bringing out that point because number one, the issue with the bringing up, uh, don't argue that this is some sort of evidence of, of, of not wanting to give them an accommodation or something. The interesting point about that is the quotation that that comes from, uh, where the supervisor supposedly said, you know, no special treatment, but the employee responded and said, well, I haven't asked you for anything. So number one, there was no request for an accommodation when that conversation happened. Um, and, and so that's, that's not an issue at all. Secondly, there is no, the accommodation that's at issue here, the only accommodation that's supposedly at issue here is, hey, I should get a second drug test, uh, take. There was never, and there has never been any assertion that the company refused to provide him an accommodation of coming in late. That's just not part of this case. Um, uh, so, but again. The lead wouldn't let him, wouldn't give him the 15 minute window, would he? No, the lead, I don't think was the issue. It was the supervisor. The lead man is supposedly the person who said, hey, he's got hep C. Um, uh, but beyond that, it doesn't matter whether Mr. Gamble told somebody at the company, I've got hep C. It doesn't matter whether he told people at the company, I'm on medications. I don't know anybody who's not taking the medication at my age. I mean, to be quite frank, I mean, if, if taking medications is a reason to say companies can't rely on a drug test, then literally no company would ever be able to rely on a drug test because, I mean, lots of people take medications doesn't mean they have a disability. And this court has previously held, uh, that, well, um, the fact that, uh, you're made aware of a, of a diagnosis that doesn't mean, you know, the person has a disability. So the mere fact that he's saying, I've got this condition and I'm taking these medications, that doesn't necessarily show that the company knows that he's got a disability. Even saying, well, this is affecting me and I can't come in, you know, on time, whatever. Again, that doesn't show the company knows he's got a disability. Uh, but again, beyond all that, where is the evidence that the company didn't reasonably rely on this drug test, given that they don't have medical expertise and the whole reason why they have DISA involved at all is that DISA does that and that the policy in question specifically says, deals with this very issue that Mr. Gamble is saying is the reason he popped positive on this, on this drug test. Excuse my informal language, but the policy specifically provides an avenue to deal with that issue. The policy specifically provides. So if, if, if you're in the employer's shoes and the employer knows we've got this policy, it allows for the medical review officer review. It allows for the employee to talk about, uh, meds. It allows for that and the policies that we have, the deal that we have with the company says, with the third party company says, they don't send us a positive drug test result. If the medical review officer has already determined that there's a legitimate reason for this test showing as a, as a positive. Um, so if they've sent us a positive confirmed positive result, that means that from the employer's view, they know that MRO DISA, they've already looked at this. They've already addressed whatever issues there are with respect to potential reasons for a false positive. And they've concluded that there's no legitimate reason for this to come back positive other than the employee, uh, took whatever the substance was that's, that's improper. So that all provides a legitimate and reasonable basis for the company to rely on this drug test result, which is exactly what they did. Now, I want to move on to, if there are no further questions about that, I want to move on to this business about the, well, hey, I requested an accommodation. Well, um, it's just not in the charge, number one. It's just not there. The, the, the appellant makes the argument that, well, yeah, he didn't use the words reasonable accommodation, but hey, he put in there something about, hey, the MRO said I could, uh, take a drug test, um, or I could do a second drug test, which again, here again, the district court got it right on the supposed MRO statement. That also was hearsay, and that has been addressed. And I do want to make one point about that before I moved on. The, the appellant argued in his slide brief that the company had not addressed or had not argued that the district court, uh, got it right with respect to this hearsay issue. They argue that, well, we didn't argue that, that the MRO statement was not hearsay, and that's just flat false. Page 20 of appellant's brief, we say, uh, in the middle of the page, at the bottom of the first paragraph, likewise, Gamow clearly offered the alleged MRO statement, i.e., that he could take a second drug test for the truth of the matter asserted. If that's not an argument that the MRO statement is hearsay, I don't know what is. So clearly, we did argue that, and the district court got it right, but. Argued that he, that his client sent some emails to the company asking for a, for a retest. And that was after the discharge, at which he just, he just said that was after the discharge, after he'd already been told about the discharge. And, you know, here again, um, the issue is not, you know, the issue is whether the company honestly and reasonably relied on the drug test result. And the, and, and the answer to that question is yes, because of all the things I've already talked about, about the policy. That's also the reason why the company would have no reason to be thinking about a second drug test when they've already made provisions in their policy for an employee to address with the MRO the possibility of a false positive, which is why they would, that would just never come up. They took the client directly from the job to get the, was it a blood test or urine test? I don't remember that off the top of my head. They took him. They did take him. Someone from, from the office, someone from the facility took him, which is in line with the policy. And there is a record evidence of, of that, of that fact. But on, on this business about the, the request for accommodation, number one, it's just not in the charge. Um, it doesn't, it's not just that the charge doesn't say reasonable accommodation. It also doesn't say that Mr. Gamow asked for a second drug test. It also doesn't say that Mr. Gamow asked Foro for a drug test. It also doesn't say that Forum denied him a drug test. It doesn't say any of that. It just says, well, hey, the drug testing company offered to retest me and I agreed to a retest. However, this never happened. That's not a request for accommodation. It, it doesn't even say he requested anything. So I don't know how you get from that language to it's in the saying, I needed a second drug test. Why? Because I say my test came back with a false positive. First of all, there's no evidence, no admissible evidence in the record that any of the drugs he was taking could cause a false positive. I know he, I know appellants cite some, uh, something in a record from some random, uh, internet search. That's just not admissible evidence. Uh, but beyond that, again, the company provides a specific procedure for an employee to account for, uh, the possibility of a false positive. They allow for that so that the, uh, they allow this whole discussion with the medical review officer, which the appellate got so that he could tell the experts the basis for why he might, uh, show up positive on a drug test. He was provided with that procedure. And that is all that is required. The, the idea that, well, I just don't like the accommodation you gave me. I don't like this procedure that I don't like the fact that, well, maybe the medical review officer got it wrong. Assuming all that's correct, this court has repeatedly held that it doesn't matter whether a drug testing company got a result wrong. All that If there are no further questions, I would, uh, ask that the court affirm the judgment of the district court in its entirety for the reasons I've previously stated. Thank you, Mr. Holmes. Can you save time for rebuttal? Thank you, Your Honor. Uh, first of all, on the hearsay point, uh, the problem from a hearsay point on the, what the drug testers said is that it's not a statement of fact. For example, if an umpire says strike one at the baseball game, and I tell you that the umpire called a strike, that's not a statement of fact. That's, that is a statement of what happened. In this case, the fact the drug tester said, the MRO said, uh, you can be retested is not a statement of fact. It is a statement by itself that has independent significance. That is telling Mr. Gamble that you can go get retested. And yes, he passed that on. The evidence in the record is that he called Ms. Suttles in HR, and that he sent emails before and after his termination. We don't have all the emails in the record. The ones we have, we have his testimony that he sent emails. With one we, the only email we have in the record is one that he was sent after his termination, just to clear that up. On the, um, issue of whether there was, if this was a request for an accommodation, or pardon me, I want to deal with the first one. They, um, uh, when he first, uh, was meeting with Mr. Bergeson, and the ten, fifteen minutes either way, the comment came up, that was actually made by Mr. Gamble. But one thing I think it's always important to remember in these cases is that we are dealing with laypeople who are not well educated. These people have probably never used the word accommodation in their regular lives. That's a legal term. And what the courts have always said is that we have to look to plain English, not magic words. Now, Mr. Gamble said, I don't, I'm not asking for an accommodation. I'm just asking for fifteen minutes either way. Well, he may think, who knows what he thought an or later on asking for a second test. That is an accommodation of sorts. I've got a disability, I, I should be retested. And finally, I want to get directly to the challenge. You know, what's the evidence that they didn't reasonably believe that drug test? Well, the, the major, the one that jumps out is the fact that Mr. Gamble told them, uh, the drug, uh, the MRO says I can be retested. Not only did they ignore that, but they lied in their termination letter saying we can't reach you. We've been trying to reach you for days. We haven't heard anything from you. That kind of statement is an indication of a guilty mind that you're trying to say, oh, we haven't, you know, we haven't heard anything from you. They didn't just say, in accordance with our policy, we reasonably believe these test results. They're saying we haven't heard from you. And the fact that somebody makes a false statement under those circumstances is an indication of a guilty mind. It's an indication they did not reasonably believe those drug test results. Thank you very much. Thank you, Mr. Holmes. Your case is under submission. For the final case of the day, uh, as we explained earlier, Judge, uh, Englehart.